## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 03 2020, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeremy L. Seal
Seymour, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF:

G.B. (Minor Child),

and

D.B. (Father),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 3, 2020

Court of Appeals Case No.
19A-JT-1247

Appeal from the
Jackson Superior Court

The Honorable
Bruce A. MacTavish, Judge

Trial Court Cause No.
36D02-1806-JT-19

**Altice, Judge.**

## Case Summary

D.B. (Father) appeals from the involuntary termination of his parental rights to his minor son, G.B. (Child). He challenges the sufficiency of the evidence supporting the termination order.

We affirm.

## Facts & Procedural History

Father and J.B. (Mother)[1] are the biological parents of Child, born in September 2011. On May 16, 2017, Indiana Department of Child Services (DCS) received a report that Child was a victim of neglect. Mother was the custodial parent and reported to be possibly homeless, and Father was incarcerated in the Jackson County Jail. The report also alleged methamphetamine use by Mother. DCS family case manager (FCM) Lesley Hewitt-Rooks investigated the report.

Because she could not locate Mother, she met with Child at his preschool and learned that sometimes Child stayed with Mother's mother (Maternal Grandmother), but that Child was currently staying with Mother in a trailer that did not have running water or electricity and had holes in the floor. There

---

[1] Mother passed away during the proceedings and prior to the termination hearing. We primarily focus on the facts related to Father.

was also no food in the home. Child told FCM Hewitt-Rooks that the visible scratches and bruises on his legs were from falling in the holes in the floor. FCM Hewitt-Rooks also learned from the trailer park leasing office that the trailer in which Mother was staying had received notice that it had to be removed from the grounds within thirty days due to its condition.

[5] Mother submitted to a drug screen on May 16, 2017, the results of which later came back positive for methamphetamine and amphetamine. FCM Hewitt-Rooks confirmed that Father was incarcerated in the Jackson County jail due to an arrest for driving while suspended and that he had previous arrests for unlawful possession of a syringe and a history of substance abuse, including confirmed methamphetamine use. Child was removed from Mother's care on May 19, 2017, and placed with Maternal Grandmother, where he has continued to reside throughout the pendency of this action.

[6] On May 22, 2017, DCS filed a child in need of services (CHINS) petition. A detention hearing was held the same day, with Mother appearing in person and Father appearing by videoconference from jail. The court continued Child's placement out of the home. Father was released from jail about a week after DCS became involved and lived with his mother at the Allstate Inn motel.

[7] An informal mediation occurred on June 21, 2017, at which Father stipulated that Child was a CHINS and agreed to a dispositional order. The court took the CHINS matter under advisement, pending a hearing for Mother, after which the court adjudicated Child a CHINS on August 7, 2017.

[8] On September 27, 2017, the court held a dispositional hearing, and the ensuing dispositional order required Father to, among other things, enroll in DCS recommended programs, obtain suitable housing, secure a stable source of income, complete a substance abuse assessment and a psychological evaluation and any recommended treatment from those assessments, submit to drug and alcohol screens, and participate in a Fatherhood Engagement program.

[9] Kim Nelson, a licensed clinical social worker and licensed clinical addictions counselor, completed a psychological evaluation of Father on September 19, 2017 pursuant to DCS referral. Father admitted that at the time of the evaluation he was using methamphetamine, heroin, opiates, and/or marijuana daily. Nelson recommended, among other things, intensive outpatient treatment (IOP) for Father. He attended some IOP sessions from September 25, 2017 to April 12, 2018.

[10] The matter came for a review hearing in October 2017. The court found that Father had "partially complied" with the case plan, participating in a fatherhood engagement program and visiting with Child, but he had not completed all evaluations for which he had been referred. *Exhibits Volume* at 69. The court determined, "Parents are not consistently participating in services to enhance their ability to fulfill their parental obligations" and the cause of Child's "out-of-home placement or supervision has not been alleviated." *Id.* Following a December 2017 review hearing, the court similarly found that Father had partially complied. Although he was participating in substance abuse group therapy, individual therapy, and inpatient treatment, was visiting

with Child, and had been meeting with Fatherhood Engagement, his last drug screen was positive for methamphetamine and amphetamine, and he was unemployed.

[11] In January 2018 Father was arrested, and in February 2018, he pled guilty in Bartholomew County to one count of Class C misdemeanor operating a vehicle with ACE of at least .08 and one count of Level 6 felony unlawful possession of a syringe. He was sentenced to probation of one and one-half years.

[12] Following an April 11, 2018 permanency hearing, the court issued an order on May 18, 2018 changing the permanency plan to adoption with a concurrent plan of reunification. The May 18 order stated:

> [Father] has not complied with the child's case plan. [Father] has stopped participating with his Fatherhood [E]ngagement worker, he continues to test positive for methamphetamine, he is not participating in substance abuse treatment or individual counseling, he has not completed a psychological assessment, he is not employed and does not have stable housing. [Father] has also not visited with [Child] since his arrest in January.

*Exhibits Volume* at 77.

[13] On June 6, 2018, Father admitted to violating his probation by using methamphetamine on April 12, 2018, and by possessing a syringe and using methamphetamine on April 18, 2018. Father was placed back on probation and placed at Lifespring in a thirty-day treatment program, but he left after two weeks when his insurance stopped paying.

[14]     On July 5, 2018, DCS filed a petition to terminate Father's parental rights. Father failed to appear at an August 2018 review hearing, and the court found Father had not complied with the case plan, was incarcerated for the majority of the reporting period, continued to test positive for illegal substances, and had not visited with Child.

[15]     Another review hearing was held in January 2019. At that point, Father was partially complying again with the case plan. He had participated in four of six IOP meetings and had submitted to drug screens, but tested positive for methamphetamine once in December 2018. After his July 2018 release, he participated in weekly supervised visits with Child, but no-showed once in December 2018. The court found that the cause of Child's out-of-home placement or supervision had not been alleviated and that DCS supervision should continue.

[16]     The termination hearing occurred on February 27, 2019. Nelson testified that as part of her September 2017 psychological evaluation of Father, she considered family history, as well as biological, psychological and social factors with regard to mental health and substance abuse issues. She learned from Father that he had been using various substances, episodically, throughout his life, with periods of not using one substance but using another. He started with alcohol twenty years prior, and then his substance abuse expanded into heroin, marijuana, opiates, and methamphetamine. She set up goals and recommended services, including long-term residential treatment, but she and Father agreed to start with a less restrictive care plan that included IOP services,

supplemental individual therapy, and recovery coaching. Father started IOP services on September 26, 2017 and his last attended group session was April 12, 2018. In total, Father attended 23 out of 70 or 80 scheduled sessions during that time. Nelson felt that Father "was moving towards" accomplishing goals and had shown improvement by March and April 2018, but then was incarcerated and did not make any further progress. *Transcript* at 44.

[17] Michelle Knight, DCS liaison at Centerstone, testified that Centerstone conducted a substance abuse assessment of Father on July 31, 2018. He was recommended for IOP group and individual therapy. She characterized Father's engagement in services as "inconsistent." *Id*. at 48. In October 2018, he attended one of ten sessions, two of four sessions in November, and five of ten sessions in December. In January 2019, he attended four of eleven sessions and five of twelve sessions in February 2019. Of those instances of non-attendance, his therapist canceled one, Father canceled two, and the rest were no-shows. There were two sessions scheduled during the week of the termination hearing in February 2019; he attended only one.

[18] Centerstone child therapist Melissa Tippetts testified that she had been working with Child since November 2017. Based on an evaluation, Child's therapeutic needs were treatment for processing trauma, coping with anxiety due to neglect, and treatment for an eating disorder in which Child would hoard food and only eat very few types of foods. Tippetts testified that Child had made progress but still needed therapy. With regard to Father, Tippetts testified that Child enjoys

visits with Father but "the inconsistency" of the visits was detrimental to Child's well-being and mental health. *Id.* at 56.

[19] CASA Katherine Lewis testified that she was Child's CASA for approximately one year. She opined that termination was in Child's best interests, as living permanently with his maternal grandparents, with whom he had been living during the entirety of the proceedings, provided Child with a stable and supportive home "versus the fact that [Father] really doesn't have stability and the ability to care for [Child]." *Id.* at 60.

[20] FCM Hewitt-Rooks testified that she first became involved with the case as the assessing FCM, then it was transitioned to someone else, and in July 2018 the case was returned to her. She testified that Father was initially involved with Fatherhood Engagement, but he did not complete the program and the referral was closed unsuccessfully. With regard to drug screens, FCM Hewitt-Rooks testified that between August and December 2018, Father was a no-show for thirty screens and that he tested positive approximately thirty times from May 2017 to February 8, 2019. She testified that Father was honest with her when she confronted him about the positive screens, admitting that he had relapsed. While he completed the required substance abuse assessments, he did not successfully complete the recommended substance abuse treatment services or recommended psychological services.

[21] With regard to visitation, she stated that throughout the life of the case, DCS had recommended only supervised visitation, for an hour and a half once a

week. She testified that, after his release from incarceration in June or July 2018, Father's visits were inconsistent but more recently had become more consistent. She recalled one visit in which Father smelled of alcohol and she performed an instant alcohol screen, after which the visit was discontinued. She testified that obtaining housing and employment was a DCS goal that had been discussed with Father but he never properly addressed it. When asked whether the conditions that led to Child's removal were likely to be remedied, she replied "No" and explained, "through the life of the case for two years he's shown instability, no housing, no employment, no way to provide for [Child]. He's used substances throughout the entire case and just showing that he's incapable of raising [Child] at this time." *Id*. at 77-78. She testified that it would not be in Child's best interest to provide Father with more time to try to and address his issues and that termination was in Child's best interests.

[22]     FCM Hewitt-Rook testified that the plan for Child was adoption by his maternal grandparents with whom he had been living for the last twenty-two months. She described that he has thrived, noting that he was behind academically upon removal and is now above average in his classwork. He is happy, healthy, and has made progress with his eating disorder. She had "no concerns whatsoever" with the grandparents' ability to care for Child. *Id*. at 81.

[23]     Father, then twenty-eight years old, also testified. He testified that he began with drugs and alcohol around age thirteen and that he had been using drugs and/or alcohol all his adult life with the longest period of sobriety being nine months. He acknowledged that he last used methamphetamine two weeks

prior to the termination hearing. At the time of the hearing, Father was not employed, he relied on others to purchase food, and his driver's license was suspended. He was living in a residence with his mother, sister, and his sister's two children. None of them were employed and did not pay rent, as a friend was letting them live there rent-free. Father acknowledged that they could be told to leave at any time and stated that the living situation "could be better." *Id.* at 21. Father estimated that he had had eight or nine jobs since release from jail in July 2018 and the longest he had been employed was a few weeks. He admitted his drug use contributed to lack of employment and his instability. At the time of the hearing, Father was currently going to IOP at Centerstone, which met three times a week, although he testified that he had recently missed a couple of appointments but could not recall exactly why. When asked why he missed an appointment at Centerstone a few days prior to the termination hearing, Father said, "I think I was sleeping." *Id.* at 86. Father asked the court for more time to continue with his treatment and DCS's recommendations.

[24] The trial court entered findings of fact and conclusions of law terminating Father's parental rights to Child, including:

> Termination is in the child's best interests . . . in that:
>
> 1. [Father] has abused illegal substances for the majority of his life, and it has impacted his ability to safely and appropriately parent his child.
>
> 2. [Father] has never had stable employment and currently does not have stable housing.

3. [Father] did not have a relationship with the child until DCS became involved. Since that time, [Father] has not proven his ability to safely and appropriately parent the child.

4. [Father] has never adequately addressed his substance use or instability.

5. [Child] is thriving in his current placement. He is happy and healthy and well cared for.

6. [Child] has made strides in his mental health and that further visitation with his father would be detrimental to his mental health.

7. [Child] has overcome many of the issues he suffered at the time of removal, including an eating disorder. He is learning how to process his past trauma and work through anxiety.

8. FCM Hewitt-Rooks and Katherine Lewis believe that termination is in the best interest of the child because of [Father]'s drug use and instability and because [Child] deserves permanency. They both believe it is in his best interest to be adopted by his current placement.

9. Due to [Father]'s lack of stability in housing and employment and his confirmed and persistent use of illegal substances, he has shown that the conditions that led to the removal of the child are not likely to be remedied.

10. It is not in the child's best interest to give [Father] more time to remedy these issues. [Father] has been given almost two years to show that he can be a safe and appropriate parent to [Child], and he has not made any progress towards that goal.

*Appellee's Appendix* at 6. The court found that a satisfactory plan for Child's care and treatment existed, namely adoption, and it terminated Father's rights. Father now appeals.

## Discussion & Decision

[25] When reviewing the termination of parental rights, we consider the evidence in the light most favorable to the prevailing party, and we will not reweigh the evidence or judge the credibility of the witnesses. *Matter of M.I.*, 127 N.E.3d 1168, 1170 (Ind. 2019). To prevail, the challenging party must show that the court's decision is contrary to law, meaning that the probative evidence and reasonable inferences point unerringly to the opposite conclusion. *Id.* "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014).

[26] It is well recognized that a parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836

(Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[27] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D)..

[28] On appeal, Father contends that DCS failed to present clear and convincing evidence that the conditions resulting in Child's removal or the reasons for placement outside the home would not be remedied and that termination is in Child's best interests. We will address each of these in turn.

### Conditions Not Remedied

[29] In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.,* 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied.* The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.,* 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied* (2002). The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.,* 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[30] Father admits that he is "not perfect" and has substance abuse issues but urges that "[he] spent the entirety of this case working on improving his situation" and, despite some "setbacks[,]" "continued to make progress." *Appellant's Brief* at 9. We cannot agree with this characterization of the evidence. Father was

incarcerated at the time of Child's removal and was incarcerated again during the proceedings after committing additional crimes. When released from incarceration, his once-per-week supervised visits with Child were inconsistent, becoming more consistent only closer to the termination hearing. He did not complete substance abuse treatment or other services as recommended after his psychological evaluation. He did not complete the Fatherhood Engagement program. Father failed many drug screens throughout the course of the proceedings, and he no-showed for drug screens about thirty times between August and December 2018. He never obtained stable employment or housing.

[31] While Father asks for more time to work on his issues, he has made effectively little to no progress in two years. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, the evidence amply supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal and/or continued placement outside the home will not be remedied.

## *Best Interests*

[32] Father asserts that the evidence was insufficient to support the trial court's determination that termination was in Child's best interests. In making this best-interests determination, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). The court must subordinate the

interest of the parent to those of the children and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re. J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[33] Father suggests that he and Child "had the proper foundation to go forward" and that "[s]evering the parent-child relationship would introduce the very instability that [DCS] intended to prevent." *Appellant's Brief* at 10. We disagree. As to their "foundation," Father did not have custody of Child and did not share much of a relationship, if at all, prior to Child's removal. While Child appeared to enjoy the supervised, once-per-week visits that he did have with Father, Father's visits were inconsistent, becoming more consistent only later in the case, and, according to Child's therapist, the inconsistency was detrimental to Child's well-being. We recognize that Father had partially complied with DCS's case plan at times during the proceedings, but Father never completed substance abuse or psychological treatments. His failure to address his substance abuse issues was reflected in the fact that he tested positive for

methamphetamine two weeks before the termination hearing. And in the same week as the termination hearing, he missed a Centerstone session for no reason other than he might have been asleep. Father he did not have a job or stable home. The totality of the evidence shows that Father cannot provide Child with the consistency and stability he needs. Both the FCM and CASA testified that termination of Father's parental rights was in Child's best interests. Accordingly, we find that sufficient evidence supports the court's determination that termination of Father's parental rights is in Child's best interests.

[34] Judgment affirmed.

Riley, J. and May, J., concur.